

**Signed November 05, 2020.**

_____
**Ronald B. King**
**Chief United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| CHERYL LYNN GATES, | § | CASE NO. 20-50159-RBK |
| | § | |
| DEBTOR. | § | CHAPTER 7 |
| _____ | § | |
| | § | |
| CHERYL LYNN GATES, | § | |
| | § | |
| PLAINTIFF, | § | |
| VS. | § | ADVERSARY NO. 20-05014-RBK |
| | § | |
| RAC ACCEPTANCE TEXAS, LLC, | § | |
| D/B/A ACCEPTANCE NOW, | § | |
| | § | |
| DEFENDANT. | § | |

**OPINION**

This adversary proceeding was filed by Cheryl Lynn Gates ("Gates") against the Defendant, RAC Acceptance Texas, LLC, d/b/a/ Acceptance Now ("RAC"). Gates, a chapter 7 debtor, seeks actual damages, punitive damages, a finding of contempt, costs, and attorney's fees

under 11 U.S.C. § 362(k) based on RAC's violations of the automatic stay.[1] Gates alleges that RAC violated the automatic stay under §§ 362(a)(1), (3), and (6) when its employees made repeated post-petition contacts with Gates to collect money due on a pre-petition furniture financing transaction.

After a two-day trial on the merits, the Court finds that RAC has willfully violated the automatic stay under § 362(k). The Court will award $110.00 in actual damages and reasonable and necessary attorney's fees and costs. The Court finds no basis on which to award further damages for contempt or to award punitive damages under § 362(k).

## Jurisdiction and Venue

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(b) and 157(b)(1). Venue is proper under 28 U.S.C. §§ 1408 and 1409. This proceeding constitutes a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Fed. R. Bankr. P. 7052.

## Background

On January 10, 2020, Gates entered into a Rental-Purchase Agreement (the "Agreement") for a mattress and a sofa with RAC at its financing office inside an Ashley Furniture HomeStore in Live Oak, Texas. Under the terms of the Agreement, Gates promised to make biweekly rental payments of $72.46 for each biweekly period that she retained the property. Gates made four payments to RAC totaling $275.69 as follows:

> On January 10, 2020, Gates paid RAC $74.99 with credit card;
> On January 17, 2020, Gates paid RAC $7.56 in cash;
> On January 17, 2020, Gates paid RAC $100.35 with credit card; and
> On January 31, 2020, Gates paid RAC $92.79 with credit card.

---

[1] All section references hereinafter shall refer to 11 U.S.C. unless otherwise specified.

Def.'s Ex. 5. No further payments were made, but Gates has continued to retain the property. *See id.* The mattress was delivered pre-petition on January 17, 2020, and the sofa was delivered post-petition on February 22, 2020. Def.'s Ex. 4.

On January 24, 2020, fourteen days after signing the Agreement, Gates filed her chapter 7 bankruptcy case.[2] Bankr. ECF No. 1. Gates listed the total value of her furniture and household goods as $500.00 on Schedule B and listed RAC as an unsecured creditor on Schedule F with a total claim amount of $71.73. *Id*. Gates did not list RAC as a secured creditor on Schedule D and did not list the Agreement as a lease or executory contract on Schedule G. *Id.* In addition, Gates did not list RAC in her Statement of Intention as a secured creditor or as the lessor in a personal property lease. *Id.* No explanation was given for the failure to properly schedule the debt. The Bankruptcy Noticing Center mailed formal notice of Gates's bankruptcy case to RAC by first-class mail on January 29, 2020. Bankr. ECF No. 6. The address used to serve RAC, and the address used in the schedules, was that of RAC's financing office in Live Oak, Texas, which is in the back of an Ashley Furniture HomeStore retail location. *Id.* Among other things, the official notice informs creditors of the bankruptcy filing, identifies Gates as the debtor, and explains the meaning of the automatic stay. *Id.*

In the weeks following Gates's bankruptcy filing, RAC staff contacted Gates to determine if she planned to return the property or renew the Agreement by making her required payments. Between February 12, 2020 and February 18, 2020, RAC's employees sent Gates two text messages and left three voicemail messages. Pl.'s Exs. 5 & 7. One text message stated, "[h]ello

---

[2] Citations to the docket in this Adversary Proceeding No. 20-05014 shall take the form "ECF No.—," while citations to the Bankruptcy Case No. 20-50159 shall take the form "Bankr. ECF No.—."

3

this is Kenneth with Acceptance Now – just a reminder that your rental is past due. Are you planning to make that payment this week?" Pl.'s Ex. 7.

On February 18, 2020, Gates answered a telephone call from RAC employee Oscar Rodriguez and advised him of her pending bankruptcy case, but noted that she intended to reaffirm her debt under the Agreement.[3] Gates testified that she instructed Rodriguez to contact her attorney and not to call her anymore. Despite putting Rodriguez on notice of her bankruptcy, Rodriguez called Gates again on February 19, 20, and 27 regarding the same account. Def.'s Ex. 6. Gates did not answer these calls, and Rodriguez did not leave a voicemail message. Meanwhile, on February 22, 2020, Gates accepted delivery of the sofa, which had been on back-order. Def.'s Ex. 4. She did not return the sofa or the mattress and maintained possession of the items through the date of trial.

RAC's employees continued to attempt to contact Gates until March 4, 2020. Def.'s Ex. 6. On March 2, Gates received a text message from RAC District Manager Patrick Walton. The text message stated:

> Please advise on your Acceptance Now Account. I just want to help! you [sic] are now 17 days past due and issue urgent on my desk to help. How about this deal $250 payment today we reset account fresh start [sic] to your next payday 3/20 Friday. Giving you a chance to catch up. This will Stop Rent A Center from visiting home this week and calls [sic] by calling in payment today. Counting on your integrity to ensure we keep building credit, ownership and you will want to do business with us again right [sic]? I know your [sic] a good customer. Please advise and call in on this great offer.

Def.'s Ex. 6. In response to this text message, Gates advised Patrick Walton by text message of her pending bankruptcy case, of the automatic stay, and asked Walton to call her attorney.[4] Pl.'s

---

[3] Rodriguez left a note on RAC's internal log for Gates's account detailing this conversation. His note reads: "CST stated she just file [sic] for bankruptcy and wants to go to the store to reaffirm. Comtract [sic]." Def.'s Ex. 6.

[4] Gates's text message in response to Patrick Walton reads:
> Three weeks ago I told the gentleman who continues to call me that I filed bankruptcy and I was waiting for my attorney to advise me on how to proceed, there

4

Ex. 31. On March 3, 2020, Gates's counsel finally sent a "cease and desist" letter to RAC, which was addressed to the Live Oak location and RAC's headquarters in Plano, Texas. Pl.'s Ex. 25. Employees at the Live Oak location received and forwarded the cease and desist letter to RAC's legal office on March 4, 2020. Although RAC does not dispute that its employees likely received notice of Gates's bankruptcy filing shortly after the January 29, 2020 notice, RAC argued at trial that neither its corporate staff nor its legal staff received notice until March 4, 2020.

In total, between the period of February 12, 2020 and March 4, 2020, RAC attempted to contact Gates regarding payment on her account at least twenty-nine times, including fourteen voicemail messages, four text messages, nine unanswered telephone calls with no voicemail message, and two emails. Def.'s Ex. 6. It was not until March 4, 2020, upon receipt of the cease and desist letter, that RAC finally marked Gates's account "do not call." Def's Ex. 6. No contact was made after March 4, 2020.

Patrick Walton testified that all employees of RAC should review the internal notes on each customer account before contacting the customer, but "it doesn't always happen." RAC's company policy expressly prohibits employees from contacting customers who have filed for bankruptcy or have notified an employee that all further communications are to come through the customer's attorney. Pl.'s Ex. 29. Specifically, if a customer notifies an employee of her bankruptcy, Walton testified that employees should notify the district manager and legal department so the customer's account can be put in "Route 50" or flagged as "do not contact." *See id.* at 115. The policy also instructs employees to avoid all contact with customers when notified

---

is an automatic stay order in place. I have repeatedly received calls, messages, text messages and emails from your company.

Pl.'s Ex. 31. Her text ends with a request to "please call my attorney," including her attorney's name and telephone number. *Id.*

of bankruptcy "regardless of how—verbal, customer letter, letter from an attorney, or notice from the bankruptcy court." *Id.* at 117.

At trial, Gates conceded that she was already experiencing menopausal symptoms of mild depression prior to bankruptcy, for which she was prescribed antidepressant medication. Gates contends, however, that the collection activity by RAC aggravated her symptoms and exacerbated her anxiety and paranoia. *See* Pl.'s Ex. 22. In an email to Thomas Nohe, a physician's assistant, on March 3, 2020, Gates asked for a prescription for anxiety to treat symptoms she was experiencing as a direct result of RAC's collection activity. Pl.'s Ex. 23. Gates explained that she was "overwhelmed with anxiety over [RAC's] repeated harassment," but that she did not "plan on taking it long term, just a month would help." *Id.* Nohe responded via email within minutes and prescribed Gates with anxiety medication. *Id.* The prescribed medication cost Gates $10.00 out-of-pocket. Pl.'s Ex. 14. Gates did not refill her prescription and later cancelled her follow-up appointment with Nohe scheduled for March 23, 2020.

During February and March 2020, Gates was employed as a tenant liaison with a commercial real estate firm. On March 20, Gates received her annual employee review for the review period January 1, 2019 through December 31, 2019. Pl.'s Ex. 15. On a performance scale of 1–5, Gates's overall rating for 2019 was 2.12. *Id.* Gates was instructed to focus on the accuracy of her work and to minimize basic administrative mistakes. *Id.* Gates was terminated from her position effective May 14, 2020, over two months after RAC's last post-petition contact with Gates.[5] Pl.'s Ex. 18. Gates attributes her poor work performance to anxiety and paranoia she experienced due to RAC's conduct.

---

[5] Gates testified at trial that she has applied for equivalent employment to no avail. She provided two rejection letters from April and July 2020. Pl.'s Exs. 19 & 20.

In addition to the loss of her job, Gates testified that she experienced severe emotional distress. Gates argued that her pre-existing emotional issues, including depression, were exacerbated by RAC's post-petition contacts.[6] *See* ECF No. 28. Specifically, Gates testified that Walton's text message on March 2, 2020 caused her severe anxiety because she believed that Walton was threatening to come to her home if she did not immediately meet his demands for payment. *See* Pl.'s Ex. 22. Gates testified that she feared RAC agents would be at her home waiting for her after work. *See id.* Due to this stress, Gates "couldn't sleep at night because every sound had [her] walking around [her] apartment with a loaded gun looking out windows scared to death." *Id.* In all, Gates alleges that she sustained damages as a result of RAC's collection efforts in the form of severe emotional distress, anxiety, and depression which exacerbated her pre-existing depressive disorder.

On March 9, 2020, five days after the cease and desist letter was received and two months before she was terminated from her job, Gates initiated this adversary proceeding by filing her complaint against RAC. Gates alleges that RAC's post-petition collection activity constituted a willful violation of the automatic stay, and she suffered severe emotional distress as a result.

## Discussion

At issue in this case is whether RAC's post-petition contacts with Gates were in violation of the automatic stay under § 362(a) and, if so, whether Gates is entitled to recover damages under § 362(k). Gates requests relief in the form of an award of actual damages of $50,000.00, punitive damages of $100,000.00, a finding of contempt under § 105(a), and reasonable and necessary attorney's fees and costs.

---

[6] Medical records produced show that Gates was diagnosed with a depressive disorder with an onset date of January 22, 2018. Pl.'s Ex. 33.

**A. RAC's post-petition contacts with Gates constituted a willful violation of the automatic stay.**

Section 362(a) of the Bankruptcy Code operates as a self-executing injunction that prohibits creditors from taking any collection actions against the debtor or property of the estate for pre-petition debts. *Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348, 354–55 (5th Cir. 2008). The automatic stay "has broad application," and is intended to shield debtors from creditors' attempts to collect pre-petition debts. *Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298, 303 (5th Cir. 2005). The automatic stay is considered "the single most important and fundamental protection provided to an individual debtor in bankruptcy." *Wilson v. Arbors of Cent. Park ICG, LLC (In re Wilson)*, 610 B.R. 255, 275 (Bankr. N.D. Tex. 2019). Without this broad protection, debtors would effectively be denied the "breathing room" that bankruptcy is intended to provide. *In re Chesnut*, 422 F.3d at 301.

When a creditor violates the automatic stay, the Bankruptcy Code provides an individual debtor with a private right of action for damages. 11 U.S.C. § 362(k); *Campbell*, 545 F.3d at 355. Section 362(k) provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." § 362(k)(1). To establish a violation of the automatic stay, Gates must show (1) that RAC knew of the existence of the stay; (2) that RAC's actions were willful; and (3) that RAC's actions violated the automatic stay. *Campbell*, 545 F.3d at 355; *see also Young v. Repine (In re Repine)*, 536 F.3d 512, 519 (5th Cir. 2008). The party seeking relief under § 362(k) bears the burden of proving each of the three elements by a preponderance of the evidence. *See In re Wilson*, 610 B.R. at 277; *Collier v. Hill (In re Collier)*, 410 B.R. 464, 472 (Bankr. E.D. Tex. 2009).

Gates has satisfied each of the three elements. The first element is satisfied because RAC had ample notice of Gates's bankruptcy. Formal notice was sent to RAC's address in Live Oak, Texas by first-class mail on January 29, 2020. Additionally, Gates gave Oscar Rodriguez verbal notice that she was in bankruptcy and provided her attorney's contact information during the February 18, 2020 telephone call. RAC was placed on notice again when Gates replied to a text message from Patrick Walton on March 2, 2020 advising of her bankruptcy. Next, Gates informed RAC of her bankruptcy and her attorney's contact information through a submission on RAC's customer portal on their website on March 3, 2020. Lastly, Gates's counsel sent a cease and desist letter to RAC's Live Oak and Plano, Texas locations on March 3, 2020 again advising RAC of Gates's bankruptcy. RAC acknowledges and does not dispute that its employees were provided with notice and indeed had knowledge of Gates's bankruptcy filing.

The second element is met because RAC's employees acted intentionally. No specific intent is required. ***Campbell***, 545 F.3d at 355. The Fifth Circuit has held that a "willful" stay violation means "acting with knowledge of the stay," meaning that the defendant merely intended to take the actions that violated the stay. *Id.* (citing ***Brown v. Chesnut (In re Chesnut)***, 422 F.3d 298, 302 (5th Cir. 2005)). Intent is established when "the creditor intended to do the actions done, at a point in time when the creditor knew of the bankruptcy." ***In re Medina***, 413 B.R. 583, 590 (Bankr. W.D. Tex. 2009). Here, the testimony of Walton and Rodriguez clearly establishes that RAC intended to collect on the debt owed by Gates by texting, calling, and emailing her reminders on her past-due account.

Last, Gates must establish that RAC's actions violated the automatic stay. Gates alleges in her complaint that RAC's conduct violated §§ 362(a)(1), (3), and (6). Of these subsections, RAC's conduct clearly falls within the parameters of § 362(a)(6). Section 362(a)(6) of the Bankruptcy Code provides that a bankruptcy petition, once filed, "operates as a stay, applicable to all entities,

9

of . . . any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." § 362(a)(6); *In re Reed*, 616 B.R. 77, 81 (Bankr. N.D. Miss. 2020).

In this case, it is undisputed that the automatic stay was imposed immediately upon Gates's bankruptcy filing on January 24, 2020. RAC never sought to lift the automatic stay. In addition to the testimony of RAC employees Oscar Rodriguez, Kenneth Hannah, and Patrick Walton, Gates produced evidence establishing that RAC's repeated contacts with Gates were clearly attempts to collect on a pre-petition debt. Walton's text to Gates on March 3 asked Gates to "[p]lease advise on your Acceptance Now Account. I just want to help! you are now 17 days past due . . ." and proposed an immediate $250.00 payment. Another text message sent by RAC in February states "[t]his is Kenneth with Acceptance Now – just a reminder that your rental agreement is due today. Please contact us at your earliest convenience." Additionally, an email sent to Gates on February 12 from RAC explicitly stated that "[t]his is a friendly reminder that your AcceptanceNOW agreement renewal is due on 02/14/2020," and included instructions for options to pay online, by telephone, or in store. Pl.'s Ex. 9.

RAC does not seriously dispute that its post-petition contacts do not constitute a stay violation under § 362(a)(6). While more experienced and/or better-trained employees would have properly followed RAC's policy guidelines for customers in bankruptcy, RAC's employees repeatedly failed to comply with company policy and permitted Gates's notice of bankruptcy to fall on deaf ears. The repeated contacts made by RAC to Gates, therefore, clearly fall within the parameters of an impermissible attempt to collect on a pre-petition debt under § 362(a)(6).

Despite being put on notice multiple times of Gates's bankruptcy, RAC employees continued to contact Gates to collect on her account until March 4, 2020, when her account was finally marked "do not call" upon receipt of her attorney's cease and desist letter. Gates has,

therefore, successfully established that RAC willfully violated the automatic stay in its post-petition contacts during the three-week period of February 12 through March 4, 2020.

### B. Statutory Damages for Willful Violation of the Stay under 11 U.S.C. § 362(k).

The Court must next consider remedies. The words "shall recover" in § 362(k)(1) indicate that the Court is mandated to award actual damages, costs, and attorney's fees where a willful violation of the stay has occurred. § 362(k)(1); *Garza v. CMM Enters., LLC (In re Garza)*, 605 B.R. 817, 829 (Bankr. S.D. Tex. 2019). Here, Gates argues that she was injured and damaged by RAC's willful violations of the automatic stay and is entitled to an award against RAC for actual damages in an amount not less than $50,000.00, punitive damages in an amount not less than $100,000.00, plus an award of attorney's fees and costs under § 362(k)(1), and a finding of contempt pursuant to § 105(a). The Court considers each request in turn.

#### a. Actual Damages

Despite the mandatory language of § 362(k)(1), Gates bears the burden of proving actual damages. *Collier v. Hill (In re Collier)*, 410 B.R. 464, 476 (Bankr. E.D. Tex. 2009) (citing *In re All-Trac Transp., Inc.*, 223 F. App'x 299, 302 (5th Cir. 2006) (requiring a connection of stay violations to "identifiable losses")). Here, Gates must establish a sufficient factual foundation for any award of actual damages, which may not be "speculative or based on conjecture." *Id*. While Gates generally asserts an entitlement to actual damages in the amount of $50,000.00, she did not provide an itemization detailing which portions of this damage amount are attributable to past and future medical expenses, physical pain and suffering, mental pain and anguish, lost wages, and/or emotional harm. RAC argues primarily that Gates has failed to establish that she "endured any more than fleeting, inconsequential, and medically insignificant annoyance, aggravation, or indignation," which does not justify an award of actual damages. *Hutchings v. Ocwen Fed. Bank, FSB (In re Hutchings)*, 348 B.R. 847, 911–12 (Bankr. N.D. Ala. 2006).

11

First, Gates argues that she lost her job as a result of the traumatic impact of RAC's post-petition collection efforts. Gates testified that she was unable to focus on her work, became distracted, error-prone, and that her overall work performance suffered because RAC's conduct exacerbated her pre-existing anxiety and depression. The evidence and testimony produced by Gates during trial contradicts this position. Gates's annual employee review, which covered the pre-petition review period of January 1, 2019 through December 31, 2019, demonstrated an already-poor work performance. On a performance scale of 1–5, Gates's overall rating for 2019 was 2.12. Additionally, Gates was terminated from her position effective May 14, 2020. This was over two months after RAC's last post-petition contact with Gates. Gates's own evidence, therefore, tends to show that that the conditions causing her to lose her job existed prior to her bankruptcy.

Next, Gates asserts that RAC's repeated contacts exacerbated her pre-existing depression and anxiety. In an email requesting a prescription, Gates wrote that she was "overwhelmed with anxiety over [RAC's] repeated harassment," and asked "is there anything you can prescribe for anxiety until this situation gets resolved? I don't plan on taking it long term, just a month would help." Her own words indicate that Gates anticipated her exacerbated condition to last only "until this situation gets resolved." Because Gates provided itemized and substantiated evidence of her medical costs, which she incurred during the short period of time that RAC contacted her in violation of the stay, the Court finds it appropriate to award Gates $10.00 in actual damages to recoup her out-of-pocket medical expenses.

Last, the Court will address emotional distress damages. Emotional damage awards "must be supported by 'specific information' rather than 'generalized assertions.'" ***Young v. Repine (In re Repine)***, 536 F.3d 512, 521 (5th Cir. 2008) (quoting ***Fleet Mortg. Grp., Inc. v. Kaneb***, 196 F.3d 265, 270 (1st Cir. 1999)). Specificity is required because "emotional damages are easier to

manufacture than other types of damages," and "the law has always been wary of claims of emotional distress." *Id.* at 521. "[H]urt feelings, anger and frustration are part of life," and Gates must present evidence of a "specific discernable injury to [her] emotional state" that is "particularized and extensive enough to meet the specificity requirement." ***In re Collier***, 410 B.R. at 477 (quoting ***Hitt v. Connell***, 301 F.3d 240, 250–51 (5th Cir. 2002)).[7]

To substantiate her claim for emotional distress damages, in addition to her one-time prescription medication, Gates presented testimony of friends and family as to her mental state. Gates's friend of 32 years, Robert Couser, testified that Gates is a tough person with a history of standing up for herself against bullies.[8] Gates's daughter and Couser, however, both testified that Gates's mental state changed in February 2020 due to RAC's conduct. During the three-week period of RAC's post-petition contacts, Gates became scared, anxious, paranoid, stressed, and constantly fearful of someone from RAC knocking down her door to exercise self-help remedies. Gates acknowledged, however, that no representative or employee of RAC threatened to knock down her door and disturb the peace. The only evidence that could remotely indicate this possibility was the text message from Patrick Walton on March 2, which mentioned that prompt payment "will Stop Rent A Center from visiting home this week." In addition, there were no face to face conversations and only one telephone call in which Gates actually spoke to an employee of RAC.

Gates did not present credible evidence of harassment or coercion by RAC. In fact, Gates testified that there was no verbal abuse by RAC employees. Rodriguez testified that his primary

---

[7] "If the world were perfect, it wouldn't be." (Attributed to Yogi Berra).
[8] To illustrate Gates's character in the face of adversity, Couser told a story about Gates from when she was in the seventh grade. During this incident, Gates was being picked on by a girl who was significantly bigger than she. The girl allegedly slammed Gates's head into a locker. Despite being scared, Gates fought back against the girl because she is not a person who is easily rattled.

13

intent when contacting Gates was to determine whether she intended to reaffirm her contract, and Walton explained that his messages to Gates were in effort to help her. Indeed, Walton's text messages contain no threatening language or coercive tactics. Gates's subjective belief that the text message constituted a threat to break down her door, bolstered by stories she read online, was unreasonable.

It is difficult to reconcile Gates's evidence that she is not a person who is easily rattled with her conflicting testimony of severe emotional distress caused by RAC's contacts. The Court finds that Gates has failed to produce the specific information needed to link RAC's stay violations to any severe emotional distress Gates may have experienced due to the exacerbation of her pre-existing anxiety and depression. The Court finds that Gates's emotional distress claims are exaggerated and based on "generalized assertions" which, in this case, does not justify an award of emotional distress damages above and beyond her medical expenses under § 362(k). *In re Repine*, 536 F.3d at 521–22.

Based on the evidence, the Court finds that Gates did not prove that she lost her job, suffered severe emotional distress, or incurred financial loss beyond minimal medical expenses because of RAC's violation of the automatic stay. Given that no award is warranted for lost wages, loss of future income, or severe emotional distress, the Court will award the aggregate sum of $10.00 for the medical expenses incurred by Gates and $100.00 for the stay violations.

### b. Punitive Damages

Turning next to punitive damages, bankruptcy courts may award punitive damages for willful stay violations "in appropriate circumstances." § 362(k)(1); *Wilson v. Arbors of Cent. Park ICG, LLC (In re Wilson)*, 610 B.R. 255, 278 (Bankr. N.D. Tex. 2019). The availability of punitive damages is designed to deter would-be stay violators from "vindicat[ing] their interests in violation of [the] automatic stay, and thereby protects debtors' estates from incurring potentially

unnecessary legal expenses in prosecuting stay violations." *In re Wilson*, 610 B.R. at 278 (quoting *In re Collier*, 410 B.R. at 478). In the Fifth Circuit, the existence of "appropriate circumstances" for punitive damages requires a finding of "egregious conduct" on the violator's part. *Monge v. Rojas (In re Monge)*, 826 F.3d 250, 256 (5th Cir. 2016); *In re Repine*, 536 F.3d at 521. In other words, Gates would be entitled to punitive damages if she could prove by a preponderance of the evidence that RAC's conduct was "egregious or vindictive." *In re Collier*, 410 B.R. at 478.

Even when a creditor's willful violation of the automatic stay causes minimal actual damages, "[p]unitive damages are a proper deterrent." *Garza v. CMM Enters., LLC (In re Garza)*, 605 B.R. 817, 830–31 (Bankr. S.D. Tex. 2019). In *In re Garza*, the bankruptcy court awarded punitive damages where the creditor had knowledge of the debtor's pending bankruptcy yet continued with its repossession of the debtor's vehicle anyway. *Id.* at 822–23. The debtor's law firm had provided the creditor with verbal notice of the debtor's bankruptcy filing and requested the creditor's fax number in order to fax over a copy of the petition. *Id.* at 822. The creditor's representative refused to provide the fax number and continued undeterred with its successful repossession of the debtor's vehicle. *Id.* at 822–23. The bankruptcy court found that the creditor acted with "reckless disregard and in arrogant defiance" of the automatic stay and awarded punitive damages to the debtor. *Id.* at 831.

In another recent case, *In re Wilson*, the bankruptcy court concluded that that a creditor's conduct was "unquestionably egregious warranting an assessment of punitive damages" where the creditor prosecuted an eviction action against the debtors despite there being "no question" of the creditor's knowledge of the stay. *Wilson v. Arbors of Cent. Park ICG, LLC (In re Wilson)*, 610 B.R. 255, 277–78 (Bankr. N.D. Tex. 2019). The court cited the "high degree of the reprehensibility" of the creditor's "flagrant disregard" for the automatic stay as a primary factor for awarding punitive damages. *Id.* at 278–79.

The failure of RAC employees to follow company policy and cease all contact with Gates does not rise to a level of reprehensibility equivalent to the creditors' conduct in *In re Garza* and *In re Wilson*. To be clear, this Court does not recognize a defense based upon ignorance or inefficiency on RAC's behalf. The Court finds instead that the actions of RAC's employees were not sufficiently "egregious" to indicate a willful disregard and disdain for the bankruptcy process. The credible testimony of RAC employees Rodriguez, Walton, and Kenneth Hannah tend to show that the post-petition contacts with Gates were attributable primarily to mistake and inadequate employee training, rather than a vindictive and/or arrogant defiance of the automatic stay. Gates conceded at trial that RAC employees never used a harsh tone with her and there was no verbal abuse in the single telephone call. Based on the evidence, the Court finds that RAC's employees' actions were not vindictive, malicious, abusive, or accompanied by bad faith. As such, an award of punitive damages is not appropriate in this case.

### c. Contempt

Section 105(a) of the Bankruptcy Code gives bankruptcy courts "the inherent power to enter civil contempt orders for violations of the court's specific orders and injunctions." ***In re Musslewhite***, 270 B.R. 72, 78 (S.D. Tex. 2000) (citing ***In re Terrebonne Fuel & Lube, Inc.***, 108 F.3d 609, 612–13 (5th Cir. 1997)). Violations of the automatic stay are punishable as contempt of court. *See, e.g.*, ***In re Reed***, 616 B.R. 77, 82 (Bankr. N.D. Miss. 2020). The movant bears the burden of establishing by clear and convincing evidence: "(1) that a court order was in effect, (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order." ***In re Musslewhite***, 270 B.R. at 79 (citing ***Am. Airlines, Inc. v. Allied Pilots Ass'n***, 228 F.3d 574, 581 (5th Cir. 2000)). Bankruptcy courts are afforded wide discretion in the use of contempt power under § 105(a). *Id.* at 77.

It is undisputed that the automatic stay was in place during the three-week period that RAC contacted Gates in violation of § 362(a)(6). The elements for civil contempt are present. Based on the same considerations previously explained, however, the Court finds no basis to award additional contempt sanctions against RAC for its conduct in violation of the automatic stay.

### d. Attorney's Fees and Costs

Gates requests attorney's fees and costs under § 362(k)(1). A debtor may recover "reasonable attorney's fees and expenses incurred in prosecuting a § 362(k) action." *In re Reed*, 616 B.R. at 83 (citing *Young v. Repine (In re Repine)*, 536 F.3d 512, 522 (5th Cir. 2008)). The Court concludes that Gates is entitled to reasonable and necessary attorney's fees for bringing this action under § 362(k) and Rule 7054 allows an award of costs to the prevailing party and for attorney's fees by separate motion after a judgment is rendered. § 362(k)(1) ("[A]n individual injured by any willful violation of a stay . . . shall recover . . . costs and attorneys' fees . . . ."); FED. R. BANKR. P. 7054. Local Bankruptcy Rule 7054 allows Gates to request attorney's fees post-judgment.

### Conclusion

After reviewing the evidence and evaluating the testimony of the witnesses at trial, the Court concludes that RAC willfully violated the automatic stay under § 362(a)(6) by contacting Gates between February 12, 2020 and March 4, 2020. Accordingly, the Court awards Gates actual damages of $110.00 and Gates's counsel will be awarded reasonable and necessary attorney's fees and costs. Gates's counsel must file an application for attorney's fees and costs within fourteen days from entry of this Court's judgment. A separate judgment will be entered.

###